IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| BRADLEY WILLIAM MONICAL, | Case No. 1:17-cv-00476-YY |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| JACKSON COUNTY, et al., | |
| Defendants. | |

YOU, Magistrate Judge.

On August 16, 2011, plaintiff Bradley William Monical was transferred from the Oregon

Department of Corrections to the Jackson County Jail. Third Am. Compl. 10, ECF 150.[1] On

November 19, 2012, plaintiff escaped from the jail's outdoor recreational yard and remained at

large for nearly a year. *Id*. Plaintiff was recaptured and booked back into the jail on November

13, 2013. *Id*.; Aldrich Decl. ¶¶ 7, 10, ECF 233. Plaintiff was booked on one count of escape in

the second degree and five counts of robbery in the second degree, and several custody holds

---

[1] Plaintiff has filed a verified complaint. *See* Third Am. Compl., ECF 150. "A verified complaint
may function as an evidentiary affidavit so long as it is based on a complainant's personal
knowledge and is signed under penalty of perjury." *Coulter v. Baca*, No. 13-cv-6090-CBM
(AGRx), 2014 WL 12589652, at *3 (C.D. Cal. May 23, 2014) (citing *Schroeder v. McDonald*,
55 F.3d 454, 460 (9th Cir. 1995); *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)).

were in place at that time, including a federal hold for armed robbery and possession of a firearm, an Oregon Department of Corrections hold, a Washington state fugitive hold, and Jackson County out-of-county warrants for robbery in the second degree, robbery in the first degree (two counts), and attempted murder. Aldrich Decl. ¶ 5, ECF 233. Plaintiff was considered "extremely dangerous, extremely manipulative," and "at high risk of attempting to escape. *Id*. ¶ 6; *see also id.*, Exs. 17 & 18, ECF 233 at 40–41.

Plaintiff, who is proceeding *pro se*, is currently incarcerated at the Oregon State Penitentiary and brings this civil rights action pursuant to 42 U.S.C. § 1983 for constitutional violations that allegedly occurred during his post-escape-and-recapture incarceration at the Jackson County Jail ("JCJ") between November 12, 2013, and September 28, 2015. *See* Third Am. Compl. 2, ECF 150. The defendants remaining in the case include Jackson County, Corey Falls, Danny Penland, Joshua Aldrich, Russell Beane, Andrew Davis, Troy Hamilton, and Timothy Higgins (collectively "defendants"). Plaintiff asserts the following claims:

(1) Defendants violated his constitutional right to access the court by denying plaintiff's requests to use JCJ's law library. *Id.* at 14–17.

(2) The conditions of plaintiff's confinement were constitutionally deficient in several ways, including the lack of outdoor exercise, use of strip searches, inadequate lighting and excessive noise, and placement in a "solid door isolation cell." *Id.* at 17–26.

(3) Defendants violated plaintiff' First Amendment rights by denying him use of the jail's phone system to call family and friends and wrongly confiscating his outgoing mail, preventing his free exercise of religion by not allowing him to

attend certain religious services, and retaliating against him for filing a Prison

Rape Elimination Act ("PREA") complaint. *Id.* 26–32.

(4) Defendants violated plaintiff's Fifth and Fourteenth Amendment rights to due

process by placing him in administrative segregation without a hearing. *Id.*

32–33.

The parties have filed cross-motions for summary judgment. *See* Def. Mot. Summ. J.,

ECF 232; Pl. Mot. Summ. J., ECF 247. Defendants move for summary judgment primarily on

the basis that plaintiff failed to exhaust available administrative remedies for his claims as

required by the Prison Litigation Reform Act ("PLRA") and that, in any event, plaintiff's claims

fail for other reasons. Def. Mot. Summ. J. 2, ECF 232. Plaintiff counters that his failure to

exhaust his claims should be excused as the grievance process at JCJ was rendered effectively

unavailable to him because, among other things, officers at the jail often refused to give him

grievance forms. Pl. Resp. 14, ECF 267.

There is no dispute that there was a grievance procedure in place at JCJ during the

relevant time, and that plaintiff did not file a grievance form for any of the issues he has brought

in the present suit. As explained more fully below, plaintiff has failed to demonstrate that the

grievance procedure was effectively unavailable for the majority of his present claims. The

grievance procedure in place at JCJ at the time required inmates to request grievance forms using

a separate inmate request form or "kite." There is no dispute that plaintiff had access to kites and

used the kites regularly to raise issues with officers at the jail. Thus, defendants are entitled to

summary judgment for any issue that plaintiff asserts in this suit for which there is no evidence

that plaintiff ever requested a grievance form via kite.

Other times, when plaintiff raised an issue and requested a grievance form via kite, officers communicated with plaintiff using the kite and worked to resolve the issue. For example, plaintiff used a kite to request a grievance form about inadequate lighting in his cell. Officers responded to the kite, replaced the bulb, and declined to give plaintiff a grievance form. Plaintiff did not send any follow-up kite on the lighting issue. So while it is true that defendants sometimes did not give plaintiff a grievance form when he requested one, that does not establish that the grievance procedure was "unavailable." Rather, it shows that, at least for certain claims, the grievance process was working as intended to resolve inmate issues quickly, and thus, defendants are entitled to summary judgment on these claims.

For other claims, the issue of exhaustion is a closer call. But even assuming that plaintiff's failure to exhaust could be excused, these claims—which include plaintiff's conditions of confinement claim based on the denial of outdoor exercise, plaintiff's First Amendment retaliation claim, plaintiff's First Amendment free exercise claim, and plaintiff's due process claim—suffer from other fatal flaws. For reasons explained below, defendants are entitled to summary judgment on these claims as well.

There is one claim, though, that does not fit into the above categories. Plaintiff's access to the courts claim survives the PLRA exhaustion analysis, though the underlying merits of this claim are not clear. Plaintiff requested law library access several times; officers granted his request the first time, but denied subsequent requests. In the face of these denials, plaintiff requested a grievance form, and defendant Sgt. Davis refused to give him a form. This rendered the grievance procedure unavailable to plaintiff for his access to courts claim, and thus his failure to exhaust that claim is excused. Further briefing is required to fully and fairly analyze the merits of plaintiff's access to the courts claim, including what remedy, if any, would be appropriate if

plaintiff were to indeed prevail on this claim. Details about what portions of that claim survive and how the parties should proceed in submitting supplemental briefing on these narrow issues are provided in the analysis and order below.

## I.       Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id*. at 324 (citing FED. R. CIV. P. 56(e)). The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II.      Allegations Outside the Two-Year Statute of Limitations

Plaintiff was held at JCJ from November 13, 2013, until September 28, 2015. Aldrich Decl., ¶ 3, ECF 233. Plaintiff initially filed this action on March 24, 2017. ECF 1. To the extent plaintiff refers to events occurring prior to March 24, 2015, those claims have been dismissed because they are outside the statute of limitations. *See* Order (Mar. 23, 2021) 37, ECF 188. Thus, only those claims arising from incidents that occurred between March 24, 2015, and September

28, 2015, are addressed here. *See Andrich v. Phillis*, No. 21-16160, 2022 WL 4234959, at *1 (9th Cir. Sept. 14, 2022) (dismissing access to courts claim based on when plaintiff knew post-conviction relief petition was deficient).

### III.    Plaintiff's First Request for Admissions

Plaintiff contends that defendants failed to timely respond to his first request for admissions ("RFA") and asks for the RFAs to be deemed admitted. Pl. Mot. Summ. J. 6–9, ECF 247. Generally, a matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection. FED. R. CIV. P. 36(a)(3). Moreover, "[t]he general power of the district court to control the discovery process allows for the severe sanction of ordering a matter admitted when it has been demonstrated that a party has intentionally disregarded the obligations imposed by Rule 36(a)." *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981).

Here, defendants filed a motion to dismiss plaintiff's Third Amended Complaint on May 11, 2020. Mot. Dismiss, ECF 160. Plaintiff's first RFA is dated May 18, 2020. *See* Pl. Mot. Summ. J. 6, ECF 247; *id.*, Ex. 4, ECF 247-1 at 49. Defendants' counsel received plaintiff's first RFA on May 26, 2020. Pietila Decl., Ex. 1, ECF 263. On May 28, 2020, defendants filed a motion to stay discovery pending adjudication of their motion to dismiss. Mot. Stay, ECF 164. The court initially granted the stay on June 16, 2020, but suspended it on June 18, 2020, to allow for additional briefing by plaintiff.[2] *See* ECF 165; ECF 168. The court reinstated the stay of discovery on July 13, 2020, and vacated all discovery deadlines. ECF 171. On March 23, 2021,

---

[2] Plaintiff filed a Motion for Extension of Time to Respond to Defendants' Motion to Stay, ECF 166, but the court did not receive that motion prior to entering the order granting defendants' Motion to Stay. *See* ECF 168. The court withdrew its order granting defendants' Motion to Stay to afford plaintiff an opportunity to respond. *Id*.

the court entered an opinion and order on defendants' motion to dismiss, ECF 188, and issued a

scheduling order. ECF 189.

Defendants served their answers and objections to plaintiff's First RFA on April 15,

2021, 23 days after the court entered its opinion and order on defendants' motion to dismiss,

lifted the stay of discovery, and issued a scheduling order. Pietila Decl. ¶ 8, ECF 263.

Defendants therefore provided a response within the 30-day time period required under the Rule

36(a)(3). On June 21, 2021, plaintiff served an additional 80 requests on defendants, to which

they provided a full response on July 8, 2021, again within 30 days. *Id*. ¶¶ 9–10. Defendants

fully and timely responded to plaintiff's discovery requests, and did not disregarded their Rule

36(a) obligations such as to warrant the severe sanction of ordering a matter admitted.

Accordingly, plaintiff's request to do so is denied.

**IV.    PLRA Exhaustion**

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under

[42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.

§ 1997e(a). Exhaustion under the PLRA is mandatory. *McKinney v. Carey*, 311 F.3d 1198, 1199

(9th Cir. 2002) (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)). A prisoner's failure to

exhaust administrative remedies may, however, be excused "when circumstances render

administrative remedies 'effectively unavailable.' " *Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th

Cir. 2010) (per curiam) (quoting *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010)). "To be

available, a remedy must be available as a practical matter; it must be capable of use; at hand."

*Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal quotation marks and citation

omitted).

Before further explaining the contours of the PLRA exhaustion requirement, it is necessary to dispense with one of plaintiff's arguments raised in the briefing—that because he is no longer in custody at JCJ, he no longer needs to satisfy the PLRA exhaustion requirement as to any claims against Jackson County. Pl. Reply 9–10, ECF 271. Plaintiff relies on numerous cases holding that the PLRA exhaustion requirement does not apply once a prisoner is no longer in custody. *Id.* (citing, among others, *Jackson v. Fong*, 870 F.3d 928, 936 (9th Cir. 2017) ("[O]nce a prisoner is no longer in custody, there is nothing to gain by forcing the prisoner through the administrative process.")).

The controlling statute requires that every "prisoner" must exhaust administrative remedies before filing a lawsuit. 42 U.S.C. ¶ 1997e(a). The language of the statute is plain and unambiguous and defines a "prisoner" as

> [A]ny person incarcerated or detained in *any facility* who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

42 U.S.C. § 1997e(h) (emphasis added); *see also Talamantes v. Leyva*, 575 F.3d 1021, 1023 (9th Cir. 2009). The statute makes no distinction as to *where* a person must be incarcerated nor does it allow for plaintiff's theory here—that because he moved to another facility, the exhaustion requirement for claims arising at the former facility no longer applies. There is no dispute that plaintiff is currently incarcerated at Oregon State Penitentiary. Thus, the exhaustion requirement applies to his present claims arising from his incarceration at JCJ (and for that matter, any future claims he might bring while he remains incarcerated or detained). *See Porter v. Nussle,* 534 U.S. 516, 520 (2002) ("[Section] 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences.").

Having determined that exhaustion applies to plaintiff's claims, the next step is to employ the burden-shifting framework used to analyze administrative exhaustion under the PLRA. First, the defendant must "prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams*, 775 F.3d at 1191. Next, "the burden shifts to the plaintiff, who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* This can include "showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Id.* (internal quotation marks and citation omitted). Although the burden of proof remains with the defendant, the defendant is entitled to summary judgment if undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust. *Albino*, 747 F.3d at 1172.

## A.    Failure to Exhaust Administrative Remedy

At the time of plaintiff's incarceration, the jail grievance procedure instructed inmates as follows:

> You are allowed to file a grievance when you have a complaint involving policies, procedures, practices, and conditions of confinement. You are required to discuss all grievances with an officer prior to submitting a formal grievance. If after this discussion you feel the complaint has not been properly addressed, you may start the formal grievance procedure. You have five (5) days from the date of the incident to file a grievance.

Aldrich Decl., Ex. 22, ECF 233 at 131. The jail employed the following five-step grievance procedure:

> **Step 1:** To file a formal grievance you must submit a kite asking for a Prisoner Grievance Form. Once you have received and filled out the grievance form completely, give it to a deputy. The deputy will sign for receipt of the form. When you fill out the grievance form, it must be legible and address a grievable issue. You must sign it and it must be free of profane language or offensive material used in a disrespectful manner.
>
> **Step 2:** A deputy will review the grievance and respond in writing as soon as

possible (usually within 48 hours). If the deputy is unable to deal with your grievance, they will forward it to the shift supervisor. If the grievance is forwarded, it could take up to an additional five days before you receive a response.

**Step 3:** If you are not satisfied with the deputy's response to your grievance, you may forward your copy of the grievance to the shift supervisor and ask that it be reviewed. You should receive a response within five calendar days.

**Step 4:** If you wish to appeal the shift supervisor's resolution of the grievance, fill out the appeal section of the grievance form. The grievance will then be forwarded to the Jail Commander.

**Step 5:** The last administrative step left to you after receiving a response from the Jail Commander is to appeal to the Sheriff. All other steps must have been completed before you can do this.

*Id.* (some punctuation omitted). Here, the record shows that between March 24, 2015, and September 28, 2015, plaintiff submitted 15 Inmate Request Forms, also known as kites or kytes, as well as some letters. Aldrich Decl. ¶ 23, ECF 233; Monical Decl., Exs. 30, 59 & 60, ECF 267 at 341, 410–11. Plaintiff did not submit any grievance forms pertaining to the claims he raises in this case. Aldrich Decl. ¶ 19, ECF 233. Thus, defendants have carried their initial burden of proving that there was an available administrative remedy that plaintiff did not exhaust for the claims he brings in this lawsuit. *Williams*, 775 F.3d at 1191.

### B.    Effectively Unavailable Remedy

The burden now shifts to plaintiff to "show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him[.]" *Williams*, 775 F.3d at 1191. This can be done by showing that plaintiff took "reasonable and appropriate steps" to pursue administrative remedies, but prison officials nonetheless interfered with the attempts to exhaust or failed to follow correct grievance protocol. *Nunez v. Duncan*, 591 F.3d at 1224. Prison officials need not intend to prevent an inmate from accessing administrative remedies to render those remedies effectively unavailable. *Id.* at 1226.

Plaintiff first argues that, as a general matter, defendants "did not operate a grievance system that provided any '[a]vailable' administrative remedies as they would not issue either grievance forms at all or their policy itself denied the requirement of grieving issues they deemed 'privileges.' " Pl. Resp. 14–15, ECF 267 (some punctuation altered); *see also id*. at 17 (pointing to declarations stating the grievance forms required "approval" from an officer). It is true that in response to plaintiff's requests for a grievance form, jail officials sometimes declined to provide him the form. *E.g.*, Aldrich Decl., Ex. 6, ECF 233 at 24. But in most instances, the responding officer did not simply deny plaintiff a grievance form; the officer took action to resolve the issue plaintiff raised. For example, on April 1, 2015, plaintiff submitted a kite regarding the "light bulb in [his] cell being replaced." *Id.* Sgt. Davis responded to the kite the same day by stating that he "put in a maintenance request to get [plaintiff's] light bulb replaced today," and denied plaintiff's request for a grievance form. *Id.* Plaintiff did not further communicate with jail officers about the lighting or request a form regarding the adequacy of the replacement bulb. As another example, on April 8, 2015, plaintiff submitted a kite stating that he could "not eat any dairy, eggs or meat products due [to] religious beliefs," and asked for his food tray to be changed. Aldrich Decl., Ex. 7, ECF 233 at 25. He complained this was the fourth time he had made the request and asked, "Do I need to file a grievance?" *Id*. On April 10, 2015, Sgt. Aldrich responded by asking for clarification regarding plaintiff's "specific beliefs that require this dietary need." *Id*. Plaintiff sent a letter to Sgt. Aldrich dated April 11, 2015, in which he addressed his religious beliefs and the accommodations he requested. *Id*., Ex. 11, ECF 233 at 29–30. On April 15, 2015, plaintiff submitted a kite explaining that he is a Seventh Day Adventist and needed a vegan diet. *Id*., Ex. 8, ECF 233 at 26. Plaintiff's diet was approved the next day, and plaintiff did not submit any other kites on the issue. *Id*. In other words, the jail received plaintiff's complaint, fixed the issue,

and did not provide plaintiff with a grievance form because the issue was resolved. This does not

establish that the grievance process was generally unavailable; it was, at least for these requests,

working as designed to resolve plaintiff's issues at the first opportunity. *See Woodford*, 548 U.S.

at 89 (2006) ("Exhaustion gives an agency an opportunity to correct its own mistakes with

respect to the programs it administers before it is haled into federal court[.]") (internal quotation

marks omitted).

Similarly, other evidence that plaintiff has provided in support of his argument that the

grievance process was "unavailable" is actually consistent with the grievance procedure in place

at JCJ at the time. For example, plaintiff submitted declarations from several other inmates at

JCJ who assert, for example, that the "daily carts for items" had kites but not grievance forms.

Monical Decl., Ex. 27 (McCurdy Decl.) at 5, ECF 267 at 102. One inmate attest that he heard

plaintiff "scream[ing] and yell[ing] at the officers to give ham an 'F…ing' grievance form and

they would not." West Decl.  3, ECF 250.[3] There is no dispute that according to the JCJ Prisoner

Information Manual in place at the time, inmates were required to "discuss all grievances with an

officer prior to submitting a formal grievance." Aldrich Decl., Ex. 22, ECF 233 at 131. Inmates

---

[3] Defendants have moved to strike the West declaration, and, in support of that motion, have provided a second declaration from West that purports to carry West's actual signature. Mot. Strike, ECF 274; Second West Decl. 2, ECF 276. The signatures on the first and second West declarations clearly do not match.

Plaintiff opposes the motion to strike and has provided several documents purporting to explain the circumstances surrounding how the original West declaration was secured, and in support has included a letter from West to plaintiff purporting to explain the circumstances surrounding how the second West declaration was secured. Monical Decl., Ex. 2, ECF 288; *see also* Reply Mot. Strike, Ex. A, ECF 284.

Suffice it to say, the reliability of the first West declaration is suspect. But the motion to strike is denied as moot; none of the facts attested to in the first West declaration are sufficient to establish that the grievance procedure was unavailable to plaintiff, or to otherwise establish a disputed issue of material fact for plaintiff's claims, and thus the expenditure of court resources to determine the truth behind how the two West declarations were secured is unwarranted.

were further told, "If after this discussion you feel the complaint has not been properly addressed, you may start the formal grievance procedure." *Id.* The first step in the formal grievance procedure was to "submit a kite asking for a Prisoner Grievance Form." *Id.* Thus, it is expected that the resource cart did not contain grievance forms, or that officers refused to distribute grievance forms upon plaintiff's verbal request because the grievance procedure required inmates to request grievance forms via kite. There is no dispute that plaintiff had access to kites and used them to call attention to several issues including law library access, conditions of confinement such as the lighting in his cell, and more. Aldrich Decl., Exs. 5–13, ECF 233 at 23–37; *id.*, Ex. 19, ECF 233 at 60 (administrative segregation log reflecting plaintiff was "given kites & resources" on May 9, 2015). In short, the evidence provided by plaintiff does not establish that the grievance procedure was generally unavailable. Where plaintiff followed the JCJ Prisoner Information Manual and engaged the formal grievance procedure via kite, those claims are further examined below; where plaintiff did not submit a kite requesting a grievance form, those claims were not brought into the formal grievance process and cannot be the basis of any claim in this suit. *See* Aldrich Decl. Exs. 5–10, 12–13, 15; *id.* ¶ 37, ECF 233; Monical Decl., Ex. 30, ECF 267 at 287; *id.*, Exs. 59 & 60, ECF 267 at 410–11.

Plaintiff also observes that the jail has since "changed their policy on how grievance forms would be issued," and no longer requires inmates to ask for a grievance form by kite, and now accepts grievances written on "any piece of paper." Pl. Resp. 15, ECF 267. This change in policy, plaintiff contends, is "evidence that jail administrators knew that their earlier procedures of just allowing a deputy to decide what could be grieved was an error." *Id.* But other than speculating about the motivation behind the new policy, plaintiff does not explain how a subsequent change in the grievance procedure somehow rendered the former administrative

process "unavailable" to him for the issues he brings in this suit. *See Fregia v. Chen*, No. 1:20-cv-1024-DAD-EPG, 2022 WL 2392964, at *7 (E.D. Cal. July 1, 2022) ("Plaintiff's argument . . . does not address how changes in procedure in 2019 made the administrative grievance procedure unavailable to him in 2018[.]"). Whatever the reason for it, the change in policy does not establish that plaintiff was prevented from using the grievance procedure for the claims he asserts in this suit.

Alternatively, plaintiff asserts that he did not grieve these issues because defendants "retaliated" against inmates who filed grievances. Resp. 17–18, ECF 267. "[T]he threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). In determining whether a threat rendered the grievance process effectively unavailable, the court first considers whether the prisoner actually believed the prison official would retaliate against him, and then considers whether the official's statements could reasonably be viewed as a threat of retaliation. *Id.* at 987–88. Plaintiff filed one grievance and numerous kites requesting grievance forms while at JCJ, which belies the conclusion that he subjectively feared retaliation for attempting to file grievances. *See Osborne v. Peters*, No. 2:20-CV-02260-MC, 2022 WL 2904395, at *4 (D. Or. July 22, 2022) ("There is also no evidence that any TRCI personnel threatened or punished plaintiff when he sought help through kytes, reports to BHS, conversations with TRCI officers, and letters to officials."); *Wilkins v. Corr. Officers*, No. CV 21-3383-VAP(E), 2022 WL 3206422, at *12 (C.D. Cal. July 13, 2022) (rejecting plaintiff's "fear of retaliation" excuse from exhaustion because he filed, among other things, several other grievances during the relevant time). And the declarations from other inmates, which vaguely assert a fear of retaliation for filing grievances, are not

specific to any particular instance or threat of retaliation and thus are not sufficient to create a disputed issue of material fact on this issue. *Cf. Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 793 (9th Cir. 2018) (finding that specific evidence of threat of retaliation included a warning that "for your own good, I'm going to forget you turned in this complaint. Keep your mouth shut," and to "not say shit" about prisoner beatings or risk being "dealt with").

Finally, plaintiff and some of the inmates assert that they were not given an inmate handbook or a description of the grievance procedure. *E.g.*, Pl. Resp. 15, ECF 267; Monical Decl., Ex. 28, ECF 267 at 112. But the documentary evidence belies any assertion that the grievance procedures was "unknown" or otherwise so "opaque" that it was rendered effectively unavailable to plaintiff. *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017) (explaining that an administrative process can be "unavailable" if it is "so opaque that it becomes, practically speaking, incapable of use because no ordinary prisoner can discern or navigate it.") (citing *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotation marks omitted). Plaintiff communicated often with jail officials about various issues, requested grievance forms, and submitted at least once grievance while at the jail. *See* Aldrich Decl. ¶¶ 20, 23, ECF 233. Furthermore, plaintiff cites to different portions of the Prisoner Information Manual in one of his kites regarding his time in administrative segregation. Monical Decl., Ex. 30, ECF 267 at 287. That same manual explains what inmates should do if they want to file a grievance and describes the different steps of the internal administrative process. *Id.*, Ex. 31, ECF 267 at 302–04. Thus, there is no dispute that plaintiff was aware of and used the administrative process as described in the JCJ Prisoner Information Manual.

In sum, as a general matter, there is insufficient evidence to create a genuine issue of material fact as to plaintiff's attack on the grievance process as a whole. That is not to say,

however, that the grievance process operated as designed for each of the issues plaintiff raises in the current suit. Thus, each of plaintiff's claims are examined below in more detail, as the facts are unique to each specific claim on the issue of exhaustion.

        **1.**        **Claim One – Access to the Courts**

In claim one, plaintiff alleges that defendants violated his constitutional right to access the courts by denying his requests to use the jail's law library. Third Am. Compl. 14–17, ECF 150. On April 28, 2015, plaintiff submitted a kite requesting access to the law library, and he was given law library access on April 30, 2015. *Id*., Ex. 5, ECF 233 at 23. On May 3, 2015, plaintiff submitted another kite regarding the law library, explaining that the law library's computer system was not working properly and requesting additional time in the library once it was fixed. Monical Decl., Ex. 59, ECF 267 at 410. Sgt. Davis responded: "you have an attorney to address your issues no library time will be given → See Prisoner Manual." *Id.* (as written). On June 12, 2015, Monical submitted another kite about the law library, stating "My attorney does not deal with my criminal appeals or issues w/ the jail. I need law library access NOW I want a grievance form thank you very much." *Id.*, Ex. 60, ECF 267 at 411 (as written). Sgt. Davis responded: "you have seen your attorney. you are now harassing with your multiple requests and will be disciplined if you chose to continue waste my time. You have been warned! you will not be issued a grievance form at this time." *Id.* (as written).

In other words, plaintiff requested a grievance form regarding law library access and Sgt. Davis refused to give him one. Monical Decl., Ex. 60, ECF 267 at 411. This shows that the grievance procedure was "effectively unavailable" for plaintiff's request for law library access. *See Albino*, 747 F.3d at 1177 (finding that administrative procedure was effectively unavailable when prison officers controlled access to Inmate Complaint Forms and refused to provide forms

to inmate despite repeated requests). Thus, defendants' motion for summary judgment for failure to exhaust is denied as to plaintiff's access to the courts claims.

As to the merits of those claims, it is well-established that an inmate has a constitutionally protected right of meaningful access to the courts under the First and Fourteenth Amendments. *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *abrogated in part on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). That right is not, however, "an abstract, freestanding right to a law library or legal assistance[.]" *Lewis*, 518 U.S. at 351. "In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (citation omitted). Thus, "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* Instead, an inmate must demonstrate that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

Plaintiff proffers three separate claims that were "hampered or denied by the defendants['] denial of access to the courts." Pl. Mot. Summ. J. 19, ECF 247. First, plaintiff alleges that the lack of access to the law library prevented him from timely seeking post-conviction and federal habeas relief related to Coos County case no. 11CR0581. Third. Am. Compl. 14, ECF 150. Second, plaintiff alleges that the lack of law library access caused him to miss filing deadlines for state and federal post-conviction relief in connection with Jackson County case no. 113373FE. *Id.* at 15. Finally, plaintiff asserts that in December of 2013 he "would have started a civil suits claim against the defendants . . . had he been given access to the law library and access to the courts." *Id.* at 16.

In previous orders, the court dismissed with prejudice plaintiff's claim that he was denied access to the courts to file a federal habeas claims regarding his Coos County conviction because the one-year deadline to timely file a habeas petition elapsed on September 13, 2014, which was outside the two-year statutory limitations period for plaintiff's current suit. Order (Feb. 5, 2020) 17, ECF 141; Order (Mar. 23, 2021) 12, ECF 188; *see also supra* Section III (explaining statutory period for present suit). Plaintiff reasserted this claim in the Third Amended Complaint despite the court's previous orders dismissing it. Third Am. Compl. 14, ECF 150. For the same reasons this claim was previously dismissed, defendants are now entitled to summary judgment on plaintiff's access to the courts claim based on plaintiff's inability to file a federal habeas action for his Coos County conviction. However, as this court previously recognized, the two-year statute of limitations for plaintiff's state law post-conviction claim regarding his Coos County conviction would have expired on September 13, 2015. Order (Feb. 5, 2020) 17, ECF 141; Order (Mar. 23, 2021) 12, ECF 188. That claim falls within the statutory period for the current suit. *See* O.R.S. 138.510(3).

As for plaintiff's claims regarding his Jackson County convictions, this court's previous orders explained that the statute of limitations for plaintiff's federal habeas and state law post-conviction relief claims fell within the statutory period for the present suit. Order (Feb. 5, 2020) 17, ECF 141; Order (Mar. 23, 2021) 12–13, ECF 188.

And finally, plaintiff's claim that he was prevented from filing a lawsuit regarding conditions of confinement at JCJ in December of 2013 is time-barred because the statutory period for claims in this suit reaches back to March 24, 2015. *See* Order (Feb. 5, 2020) 21, ECF 141; Order (Mar. 23, 2021) 13, ECF 188; *see also supra* Section III. Thus, defendants are

entitled to summary judgment on plaintiff's access to the courts claim based on his inability to file suit in 2013.

That leaves, though, plaintiff's access to the courts claim based on state law post-conviction relief for his Coos County conviction, and federal habeas and state law post-conviction relief for his Jackson County conviction. Given the sprawling record and complex briefing provided in support of the cross-motions for summary judgment and in particular the issue of exhaustion for each of plaintiff's claims, the details of the parties' arguments and the record offered in support are not sufficiently clear to determine which party should prevail on the cross-motions for summary judgment on these narrow issues. For one, neither party discusses the effect of plaintiff's state post-conviction petitions filed in 2017 on plaintiff's access to the courts claims; there is an excerpt of plaintiff's briefing in the appeal of those petition which seems to suggest that some part of the untimeliness of plaintiff's petition was excused. *See* Monical Decl. Ex. 55 at 8, ECF 267 at 393. Furthermore, neither party addressed what remedy, if any, would be appropriate if plaintiff were to prevail on portions of his access to the courts claim. To ensure that both parties have a full and fair opportunity to present their arguments on the merits of these specific portions of plaintiff's access to the courts claim, the parties shall submit supplemental briefing in support of their motions for summary judgment on the following issues:

- Plaintiff's claim that defendants prevented him from bringing a suit for post-conviction relief under state law regarding Coos County case no. 11CR0581, including what effect, if any, plaintiff's 2017 post-conviction petition (Marion County Circuit Court case no. 17CV13576) and appeal have on the analysis. *See* Monical Decl. Ex. 55, ECF 267 at 386–95.

- Plaintiff's claim that defendants prevented him from bringing a suit for federal habeas relief or post-conviction relief under state law regarding Jackson County case no. 113373FE, including what effect, if any, plaintiff's 2017 post-conviction petition (Marion County Circuit Court case no. 17CV13576) and appeal have on the analysis. *See id.*

- What remedy, if any, would plaintiff be entitled to if he were to prevail on any or all of the surviving access to the courts claims.

A supplemental briefing schedule will be entered in a separate order.

## 2.    Claim Two – Conditions of Confinement

Plaintiff's second claim for relief alleges that the conditions of his confinement were constitutionally deficient in several ways, including the lack of outdoor exercise, use of strip searches, inadequate lighting and excessive noise, lack of showers, and placement in a specific "solid door isolation cell." Third Am. Compl. 17–26, ECF 150.

As previously noted, plaintiff submitted a kite regarding the lighting in his cell, and the lightbulb was replaced. Aldrich Decl., Ex. 6, ECF 233 at 24. Plaintiff did not communicate further with jail officials or request a grievance form regarding the replacement bulb via kite. Thus, there is no evidence from which to conclude that the administrative process was rendered "unavailable" to plaintiff regarding the lighting in his cell. Similarly, plaintiff never sent a kite requesting a grievance form regarding the use of strip searches, the lack of showers, any alleged excessive noise in his cell, or the use of a solid door isolation cell.[4] *See* Third Am. Compl. 22–

---

[4] Plaintiff's due process claim regarding his time spent in segregation is addressed separately below. *See* Third Am. Compl. 32–33, ECF 150; Monical Decl., Ex. 30 at 1, ECF 267 at 287 (kite requesting grievance form "as no officer can tell me anything and my confinement is beyond stated jail rule and procedure policy.").

25, ECF 150; *see Sapp v. Kimbrell*, 623 F.3d at 827 (rejecting inmate's argument that he should be excused from the exhaustion requirement because "he never even attempted to file any such grievance," and thus "he could not have reasonably believed that he could not pursue the administrative appeals process any further").

As for the lack of outdoor exercise, plaintiff alleges that defendants "denied plaintiff adequate access to both indoor and outdoor exercise, by not allowing such exercise time and not providing adequate footwear to exercise safely without injury." Third Am. Compl. 17, ECF 150. The only communication with jail officials on this issue occurred on March 29, 2015, in which plaintiff submitted a kite that briefly mentioned an exercise restriction:

> I was given 3 days sanction and 5 days loss of rec yard on 3/18/15. I'm still currently in segregation on safety and security. Could you please tell me exactly why I've been allowed no phone to call lawyer or exercise time nor allowed to use phone to make PREA claim. It seems as though I'm being punished for asking to make claim.

Monical Decl., Ex. 40, ECF 267 at 341 (some capitalization and spelling modified). There is no response to this kite in the record. This brief mention of plaintiff's apparent exercise restriction while he was in administrative segregation is not sufficiently related to the claims in his current lawsuit to have exhausted the current claims through the administrative procedure at the jail. Plaintiff did not request a grievance form, which is the first step in the formal grievance process; this alone is sufficient to grant defendants' motion for summary judgment against plaintiff's lack of exercise claim. Furthermore, this kite does not mention the adequacy of jail-issued footwear for exercise use, and no other kite mentions that defendants deprived plaintiff of recreational opportunities, or requests a grievance form for those issues.

Even if plaintiff's failure to grieve the issue of exercise time was excused, other evidence in the record establishes the plaintiff was given many opportunities for recreation time, including

while he was in administrative segregation. Inmates at the jail are allowed to use a "dayroom," approximately 30 feet by 10 feet, for recreation during day time hours. Aldrich Decl. ¶¶ 45–46, ECF 233. The Administrative Segregation Log shows that between March 17, 2015, and September 28, 2015, plaintiff was offered recreation time on at least 115 different occasions, often in the dayrooms. *Id.* ¶ 42; *see also*, *e.g.*, *id.*, Ex. 19, ECF 233 at 57–58 (log showing recreation times). Sometimes plaintiff refused this recreation time. *E.g.*, *id.*, Ex. 19, ECF 233 at 60. This level of access is sufficient to protect plaintiff's constitutional rights. *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) (finding that similarly-sized "day room" available for walking or other individual exercises was sufficient for constitutional purposes).

And while defendants admit to limiting plaintiff's access to outdoor recreation, they had a legitimate penological reason for doing so. Def. Mot. Summ. J. 25, ECF 232; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Plaintiff escaped from JCJ in 2011, and was considered to be "extremely dangerous, extremely manipulative, and a high risk [for] escape attempt." Aldrich Decl. ¶ 6; *see also id.*, Ex. 18, ECF 233 at 41 ("Consider [plaintiff] to be one of the most dangerous people you have dealt with. Don't let your guard down for even a second."). On March 17, 2015, in the same outdoor recreation yard from which he escaped in 2011, plaintiff was observed trying to cover the camera view with his shirt, an action that jail officials interpreted as another escape attempt. *Id.*, Ex. 17, ECF 233 at 40 (inter-department memo explaining that plaintiff "was seen tapping on and trying to look through the one way glass. He also attempted to block the camera view with his t-shirt."). Thus, defendants had a legitimate penological interest in restricting plaintiff's outdoor recreation opportunities based on his past escape and later perceived attempt to do the same. For all of these

reasons, defendants' motion for summary judgment is granted and plaintiff motion for summary judgment is denied as to plaintiff's conditions of confinement claim.

### 3.    Claim Three – First Amendment Violations

Plaintiff's third claim for relief alleges that defendants violated his First Amendment rights by denying him the use of the jail's phone system to call family and friends, wrongly confiscating his outgoing mail, retaliating against him for filing a Prison Rape Elimination Act ("PREA") complaint, and preventing his free exercise of religion by not allowing him to attend certain religious services. Third Am. Compl. 26–32, ECF 150.

Plaintiff never raised the issue of phone access for calling friends and family via kite and never requested a grievance form on this issue. On March 29, 2015, plaintiff sent a kite which stated as follows:

> I was given 3 days sanction and 5 days loss of rec. yard on 3/18/15. I'm still currently in segregation on safety and security, could you please tell me exactly why. I've been allowed no phone to call lawyer or exercise time, nor allowed to use phone to make PREA claim. It seems as though I'm being punished for asking to make claim.

Monical Decl., Ex. 40, ECF 267 at 341 (some capitalization and spelling modified). He did not request a grievance form for any of the issues in this kite, which as explained above, is the first step in the JCJ's formal grievance procedure. Nor did he send a kite to explain, as his complaint does now, that the timing of his use of the day room was inadequate to allow him to talk with his father or other family members and friends. Third Am. Compl. 27–28, ECF 150. Thus, plaintiff failed to exhaust the administrative remedy on his claim regarding use of the jail's phone system to call family and friends.

Similarly, none of plaintiff's kites complain about an ongoing problem with outgoing mail. One of plaintiff's letters to the Jackson County Sheriff mentions that he had previously filed a grievance about the jail's outgoing mail policies and describes another mail issue, but the

letter does not request a grievance form and there is no other evidence that plaintiff ever attempted to start the administrative review process regarding any new issue with outgoing mail. Monical Decl., Ex. I, at 5, ECF 151 at 27; *see also* Aldrich Decl. ¶ 20, ECF 233 (noting that plaintiff filed one grievance regarding outgoing mail in 2014). Thus, defendants are entitled to summary judgment on plaintiff's First Amendment claims regarding phone access to call family and friends and on issues related to outgoing mail.

Plaintiff also alleges that defendants violated his First Amendment rights by placing him in solitary confinement in retaliation for his suggestion that he might file a PREA complaint against an officer. Third Am. Compl. 31–32, ECF 150. As mentioned above, plaintiff submitted a kite on March 29, 2015, in which he asked about the PREA call. Monical Decl., Ex. 40, ECF 267 at 341. Defendants never responded to this kite. *Id.* Two days later, plaintiff submitted another kite, stating that "[a]s of today, I still have not been allowed to make a phone call to the PREA number." Aldrich Decl., Ex. 13, ECF 233 at 32. Plaintiff complained he was told on March 18, 2015, that the day shift would allow him to make a PREA phone call, and he requested a grievance form. *Id*. Sgt. Davis responded to the kite on April 1, 2015:

> I brought you out on 03.19.15 to make a PREA phone call. At that time you informed me that you needed to make another phone call before 15:00 (Eastern Time). I forwarded that information to the other supervisor, as I do not work at that time. I also informed you that you had other avenues to file a [PREA] complaint such as sending a sealed envelope to the Sheriff or Marshals. I received a letter from you on 03.21.15 stating you decided to send a sealed letter to the Sheriff. On 03.29.15 I received the letter and forwarded it to the Sheriff. If you would like to make the phone call in addition to sending the letter, we will give you an opportunity today. I will not issue you a grievance at this time.

*Id*. at 32–33. Indeed, the record contains an email that Sgt. Davis sent to his supervisor on March 19, 2015, relaying plaintiff's request to make a PREA phone call, asking for another officer to "bring [plaintiff] out to make the phone call," and including the 1-800 phone number. *Id*. at 34.

24 – OPINION AND ORDER

On March 21, 2015, plaintiff sent a letter to Sgt. Davis to thank him "for your concern with the issue and your quick and professional response and attitude." *Id*. at 36. Plaintiff wrote on an April 2, 2015:

> Dear Sir, I was not implying that you had done anything wrong in my request for a grievance over being allowed to make a call on day shift. I was aware of your efforts, wrote as much to the sheriff. It was a miscommunication then between us that I was writing the sheriff a letter in addition to reporting the crime. I was allowed to call the FBI yesterday and leave a message. Thank you.

*Id*. at 37.

The record thus reflects that the PREA call or reporting issue was resolved to plaintiffs' satisfaction, and plaintiff's complaint seems to recognize as much. *See* Third Am. Compl. 32, ECF 150 ("To be clear here. I am not filing claim for violation of not filing a PREA complaint or following it's Federal requirements, I am filing a violation of my first amendment rights to file a valid claim and these defendants actions chilling my attempts by placing me in solitary confinement.") (as written).

Plaintiff never requested a grievance form, and thus this claim is not exhausted. Even if plaintiff's failure to exhaust this claim is excused because, for example, defendants never responded to plaintiff's March 29, 2015 kite, the claim still fails. A successful First Amendment retaliation claim in the prison context requires the following: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). "The Ninth Circuit has found that preserving institutional order, discipline and security are legitimate penological goals which, if they provide the motivation for an official act taken, will defeat a claim of retaliation." *Penton v. Johnson*, No. 2:11-cv-0518 TLN KJN P, 2019 WL

6618051, at *8 (E.D. Cal. Dec. 5, 2019), *report and recommendation adopted,* No. 2:11-cv-0518 TLN KJN, 2020 WL 1862346 (E.D. Cal. Apr. 14, 2020) (citing *Barnett v. Centoni,* 31 F.3d 813, 816 (9th Cir.1994); *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir. 1985). It is the plaintiff's burden to prove the absence of a legitimate correctional goal. *Pratt v. Rowland,* 65 F.3d 802, 806-07 (9th Cir. 1995). "[F]ederal courts ought to afford appropriate deference and flexibility to prison officials" when evaluating proffered legitimate goals. *Id.*; *Banks v. Oregon,* No. 2:12-cv-01651-MC, 2014 WL 1946552, at *3 (D. Or. May 12, 2014) ("The nature of a retaliation claim requires that it be 'regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.' ") (quoting *Adams v. Rice,* 40 F.3d 72, 74 (4th Cir. 1994)).

Here, plaintiff's claim fails on the fifth element, because the documentary evidence shows that plaintiff was placed in administrative segregation after jail officials observed him engaged in a "perceived escape" from the same recreational yard that plaintiff had previously escaped. Aldrich Decl. ¶¶ 13–14, ECF 233. On March 17, 2015, plaintiff was observed trying to cover a camera with his towel or t-shirt, and "trying to look through the one way glass," Aldrich Decl., Ex. 17, ECF 233 at 40, and into the "deputy station in what appeared to be an attempt to see [the] monitor screen." Monical Decl. ISO Third Am. Compl., Ex. E, ECF 151 at 18. The Disciplinary Incident Report states that plaintiff's conduct violated rules against "disrupt[ing] or interfere[ing] with security of . . . the facility," and "tampering with or blocking any locking device or electronic device." Monical Decl. ISO Third Am. Compl., Ex. E, ECF 151 at 18.

Notably, plaintiff did not deny that he attempted to cover the camera or look into the deputy station; he wrote in response to the disciplinary report that the jail should post a notice regarding how easily the cameras might be blocked by persons of a certain height and that he

was indeed looking into the deputy station, though plaintiff claims it was not to view the security monitors, but to get the deputies' attention. Monical Decl. ISO Third Am. Compl. Ex. K, ECF 151 at 54. Whatever plaintiff now claims were his motivations during this incident, given plaintiff's successful escape from the same recreation yard at the jail, defendants' actions in placing him in administrative segregation for his "perceived escape measures" were reasonably related to advancing the legitimate penological objective of ensuring the safety and security of the facility and preventing plaintiff from escaping again. Defendants are thus entitled to summary judgment on plaintiff's First Amendment PREA retaliation claim.

Finally, plaintiff claims that defendants violated his First Amendment rights by "refusing to allow plaintiff to attend religious services" and, though it is not clearly alleged as a separate violation, by providing access only to a jail chaplain who was "of a different faith religion" than plaintiff. Third Am. Compl. 29–30, ECF 150. Plaintiff sent several kites regarding religious practices, but these raised various dietary requests related to his religion and a request for a certain religious text. *See* Aldrich Decl., Exs. 7–11, ECF 233 at 25–30. Jail officials responded to each of these kites and the issue in each one appears to have been resolved. *Id.* More importantly, none of the kites mention the issues in plaintiff's current complaint—that defendants denied him the opportunity to attend a particular religious service or to visit with clergy of his own faith. Third Am. Compl. 29–30, ECF 150; *see also* Monical Decl., Ex. L at 1, ECF 151 at 56 (JCJ Prisoner Information Manual entry directing inmates who "are interested in going to church on Sunday" must "submit a prisoner request form on Saturday"). There is no documentary evidence in the record reflecting that plaintiff ever sent a kite about these particular religious practices or requesting a grievance form on these issues. Plaintiff alleges that he did send kites to certain officers requesting to attend services, but "they never replied to my requests to attend these

services," though there is no evidence of these unanswered kites in the record. Third. Am. Compl. 29–30, ECF 150. Plaintiff also asserts that his failure to exhaust the administrative remedies on this religious practices claim should be excused because attendance at the church services was a "privilege" that is specifically exempted by policy from the JCJ grievance procedure. Pl. Resp. 23, ECF 267; Monical Decl., Ex. 10 at 1, ECF 247-1 at 70.

But even if plaintiff's failure to exhaust is excused, whether because defendants failed to respond to plaintiff's requests or the church service attendance was not a grievable issue by policy, defendants are entitled to summary judgment on plaintiff's First Amendment claim regarding these religious practices. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST., amend. I. Inmates "retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). But "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). And "[m]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." "*Bell v. Wolfish*, 441 U.S. 520, 521 (1979); *see also Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) ("A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

An inmate bringing a free exercise claim has the initial burden to establish that the defendants' conduct substantially burdened a sincerely held religious beliefs. *Jones*, 791 F.3d at

1031. "A substantial burden places more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 1031–32 (quoting *Ohno v. Yasuma,* 723 F.3d 984, 1011 (9th Cir. 2013)) (alterations omitted). If the inmate succeeds in establishing a substantial burden, the defendants must identify a legitimate penological interest that justifies the restriction of the inmate's free exercise rights. *Id.* at 1032 (citing *O'Lone*, 482 U.S. at 349).

Plaintiff asserts that his right to attend religious services and the right to "access clergy of one['s] own religion" are clearly established and that the defendants' limitation on these activities or privileges was a substantial burden to his religious beliefs. Pl. Resp. Mot. Summ. J. 52, 54, ECF 267. Defendants dispute that these limitations were a substantial burden on plaintiff's religious beliefs because defendants allowed plaintiff to engage in other religious practices, to access printed religious materials, and accommodated plaintiff's dietary requests based on his religion. Even assuming, without deciding, that the limitations imposed on plaintiff were a substantial burden, they were justified by a legitimate penological interest and the condition imposed is not greater than necessary to protect those interests. *Turner*, 482 U.S. at 89. Thus, defendants are entitled to summary judgment on this claim.

As detailed above, plaintiff was moved to administrative segregation after deputies observed him engaged in activities they interpreted as another attempt to escape from JCJ. Aldrich Decl. ¶¶ 13–14, ECF 233. Based on this observed behavior, plaintiff's prior escape history, and other observations, defendants considered plaintiff to be dangerous, manipulative, and an extreme risk for escape. Aldrich Decl., Ex. 17, ECF 233 at 40; *id.*, Ex. 18, ECF 233 at 41; *id.*, Ex. 20 at 18, ECF 233 at 122. Furthermore, the effect of the restrictions imposed on plaintiff

is mitigated by defendants' other efforts to accommodate plaintiff's religious practices, providing meals as plaintiff requested to conform with his religious preferences, and granting plaintiff's request for certain religious texts. Aldrich Decl., Exs. 7–10, ECF 233 at 25–28. Thus, the restriction on plaintiff's participation in certain religious activities which threatened the safety and security of the facility was justified by a legitimate penological interest, and defendants' motion for summary judgment against plaintiff's free exercise claim is granted.

### 4.    Claim Four – Denial of Due Process

Finally, plaintiff's fourth claim for relief alleges that defendants violated his Fifth and Fourteenth Amendment rights to due process by placing him in administrative segregation without a hearing. Third Am. Compl. 32–33, ECF 150. And as already described, plaintiff filed submitted two kites about his time in administrative segregation. Plaintiff submitted a kite on March 29, 2015, in which he wrote:

> I was given 3 days sanction and 5 days loss of rec yard on 3/18/15. I'm still currently in segregation on safety and security. Could you please tell me exactly why I've been allowed no phone to call lawyer or exercise time nor allowed to use phone to make PREA claim. It seems as though I'm being punished for asking to make claim.

Monical Decl., Ex. 40, ECF 267 at 341 (some capitalization and spelling modified). And on an April 17, 2015 kite, plaintiff wrote:

> As per sanctions for major rule violations in Rulebook #1 placement in disciplinary separation for a period not to exceed 30 days.
>
> This sanction rule applies for rule #18 escape, attempting or planning escape. #19, #20 and #3 of which I was given a 3 day sanction for on the 17th of March. It has now been 31 days I've been in isolation with no explanation as to why. Could I please get a grievance form as no officer can tell me anything and my confinement is beyond state jail rule and procedure policy.

*Id*., Ex. 30, ECF 267 at 287 (some capitalization and spelling modified). Defendants did not respond to either kite.

Neither of these kites mention the issue raised by plaintiff's current claim—that defendants failed to provide him due process before placing him in administrative segregation following his perceived escape attempt. The April 17 kite raises the length of plaintiff's stay in segregation in relation to the various rules he violated, and not the lack of hearing before being placed there. Plaintiff's failure to raise the issue of a lack of hearing in a kite or grievance form establishes that he failed to properly exhaust this claim, and thus defendants are entitled to summary judgment on plaintiff's fourth claim for relief.

And even if plaintiff's kites could be favorably construed as raising a general complaint about defendants' failure to follow certain procedures related to his placement in administrative segregation, plaintiff's claim would still fail. "The Due Process Clause of the Fourteenth Amendment protects liberty interests that arise either under the clause itself or under state law." *LaFleur v. Nooth*, No. 2:12-CV-00637-SI, 2014 WL 1236138, at *3 (D. Or. Mar. 25, 2014) (citing *Chappell v. Manderville,* 706 F.3d 1052, 1062 (9th Cir. 2013)). Due process claims require a determination of (1) whether a governmental actor interfered with a recognized liberty or property interest; and (2) whether the procedures surrounding the alleged interference were constitutionally sufficient. *Smith v. Powell*, No. 2:14-CV-01725-SB, 2016 WL 11384325, at *4 (D. Or. Jan. 25, 2016), *report and recommendation adopted,* No. 2:14-CV-01725-SB, 2016 WL 1183086 (D. Or. Mar. 28, 2016), *aff'd,* 693 F. App'x 610 (9th Cir. 2017) (citing *Kentucky Dep't of Corrections v. Thomson*, 490 U.S. 454, 460 (1989)).

"Lawfully incarcerated persons retain only a narrow range of protected liberty interests," *Chappell*, 706 F.3d at 1062–63. "Standing alone, the Due Process Clause does not confer a liberty interest in freedom from the conditions or degree of confinement ordinarily contemplated by a prison sentence." *Sandin v. Conner*, 515 U.S. 472, 480 (1995). An inmate's liberty interest

may arise if prison officials' actions affect the inmate's sentence in an unexpected way, or impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (quoting *Sandin*, 515 U.S. at 484. Three factors determine whether a condition is atypical and significant: "1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 987 (9th Cir. 2014) (quoting *Ramirez,* 334 F.3d at 861).

Here, the administrative segregation unit plaintiff to which he was assigned was the same one used for all inmates at the jail. Monical Decl., Ex. 24 (Asbil Decl.), ECF 267 at 88; *id.*, Ex. 25 (Patton Decl.), ECF 267 at 91; *id.*, Ex. 28 (Hunsley Decl.), ECF 267 at 108. And there is no evidence that plaintiff's assignment to administrative segregation had any effect on his overall sentence. *See Smith*, 2016 WL 11384325 at *5 ("[The plaintiff] does not allege that he experienced conditions different than other inmates who are housed in segregation. Similarly, with regard to the third factor, [the plaintiff] does not allege that his segregation extended the duration of his sentence."); *Remington v. Myrick*, No. 2:16-cv-01993-PK, 2017 WL 3319112, at *4–6 (D. Or. Aug. 3, 2017) (finding no due process violation where the plaintiff alleged that "constant noise and lighting" in disciplinary segregation "made sleep difficult," and noting that the plaintiff "was confined under the same conditions as other inmates" in segregation and "[h]e does not allege that he suffered from any personal characteristics that would have made conditions in [segregation] particularly difficult for him").

Thus, the analysis depends on the duration of plaintiff's assignment to administrative segregation and the "degree of restraint imposed." *Brown*, 751 F.3d at 987. "Typically, administrative segregation in and of itself does not implicate a protected liberty interest." *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing, *Sandin*, 515 U.S. at 486 ("[D]isciplinary segregation, with insignificant exceptions, mirror[s] those conditions imposed upon inmates in administrative segregation and protective custody."). Judges in this district have declined to find any bright-line rule that a specific amount of time in segregation gives rise to a liberty interest. *Smith*, 2016 WL 11384325, at \*5 (citing *LaFleur*, 2014 WL 1236138 at \*4-5) (collecting cases, and noting that placements in segregation from 40 days to 2.5 years have been found not to be "significant and atypical"). Plaintiff was assigned to segregation between March 17, 2015, through September 28, 2015, or for 195 days. Aldrich Decl. ¶¶ 41–43, ECF 233. Numerous cases have found that a similarly long stay in administrative segregation did not implicate a protected liberty interest. *White v. Taylor*, No. 2:17-CV-00981-AC, 2020 WL 3964996, at \*6 (D. Or. July 13, 2020), *appeal dismissed,* No. 20-35628, 2021 WL 3025619 (9th Cir. Jan. 20, 2021) (180 days); *Rodgers v. Reynaga*, No. CV 1-06-1083-JAT, 2009 WL 62130, at \*2 (E.D. Cal. Jan. 8, 2009); (five months); *Smith*, 2016 WL 11384325 at \*5 (120 days); *see also Jones v. Baker,* 155 F.3d 810 (6th Cir. 1998) (two-and-a-half years).

Finally, even assuming plaintiff's time in administrative segregation could give rise to a liberty interest, defendants used adequate procedures to satisfy plaintiff's due process rights by notifying plaintiff of the charges against him, holding an informal, non-adversary evidentiary review, giving plaintiff the opportunity to present his views, and conducting periodic reviews of his confinement to segregation. Monical Decl., Ex. 45, ECF 267 at 372; *id.*, Ex. 46, ECF 267 at 373; *id.*, Ex. 48, ECF 267 at 379–80; Aldrich Decl., Ex 20, ECF 233 at 105–24. These

procedures are precisely the kind that the Supreme Court and the Ninth Circuit have ruled are sufficient to protect an inmate's procedural due process rights for placement in administrative segregation. *E.g.*, *Hewitt v. Helms*, 459 U.S. 460, 473, 476–77, n.9 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472 (distinguishing between disciplinary and administrative segregation and the different procedures necessary to satisfy procedural due process in each instance); *Mendoza v. Blodgett*, 960 F.2d 1425, 1430 (9th Cir. 1992), *abrogated in part on other grounds by Sandin*, 515 U.S. 472.

For all of these reasons—plaintiff's failure to specifically raise and his exhaust his claim about the procedures used for the administrative segregation determination, the lack of liberty interest given the duration and conditions of the administrative segregation, and the constitutional adequacy of the procedures used—defendants' motion for summary judgment against plaintiff's due process claim is granted.

## V.    Dismissal Without Prejudice

"If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice." *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled on other grounds by Albino*, 747 F.3d at 1162; *see also Carrea v. California*, 551 F. App'x 368, 369 (9th Cir. 2014) (remanding for the entry of dismissal without prejudice because the proper remedy for non-exhaustion is dismissal without prejudice) (cited pursuant to Ninth Circuit Rule 36-3). Even if plaintiff "can no longer exhaust administrative remedies as to the claims in this case" and "refiling his complaint . . . would be futile," this court is "bound by *Wyatt v. Terhune*" to dismiss this case without prejudice. *Williams v. Oregon Dep't of Corr.*, No. 3:10-CV-884-JO, 2013 WL 867181, at *2 (D. Or. Mar. 6, 2013).

Thus, plaintiff's claims regarding conditions of confinement, First Amendment violations, and the denial of due process are dismissed without prejudice for failure to exhaust.

**ORDER**

Defendants' motion for summary judgment (ECF 232) is GRANTED and plaintiff's motion for summary judgment (ECF 247) is DENIED as to plaintiff's claims regarding conditions of confinement, First Amendment violations, and the denial of due process. Those claims are dismissed without prejudice because plaintiff failed to exhaust the available administrative remedies before filing suit.

The motions for summary judgment remain pending as to plaintiff's access to the courts claim. Plaintiff's failure to exhaust this claim is excused because he was prevented from filing a grievance form and starting the administrative process. The parties are ordered to submit supplemental briefing that addresses only the following issues related to plaintiff's access to the courts claim: 1) plaintiff's claim that defendants prevented him from bringing a suit for post-conviction relief under state law regarding Coos County case #11CR0581; (2) plaintiff's claim that defendants prevented him from bringing a suit for federal habeas relief or post-conviction relief under state law regarding Jackson County case #113373FE; and (3) what remedy, if any, would plaintiff be entitled to if he were to prevail on any or all of the surviving access to courts claims. A supplemental briefing schedule will be entered in a separate order.

Defendants' motion (ECF 274) to strike the declaration of Fredrick Charles West (ECF 250) in support of plaintiff's motion for summary judgment is denied as moot.

IT IS SO ORDERED.

DATED December 16, 2022.

_/s/ Youlee Yim You_
Youlee Yim You
United States Magistrate Judge